GEICO GENERAL INSURANCE COMPANY, Plaintiff–Appellant,

v.

Michael BERGUIRISTAIN, Nicole Melissa Galindo, Frank Galletti, Maria Galletti, Ann Marie Magri, et al, Defendants–Appellees.

No. 17–11010
Non–Argument Calendar

United States Court of Appeals, Eleventh Circuit.

(September 8, 2017)

Billy Richard Young, Michael Todd Bill, Young Bill Boles Palmer & Duke, PA, Tampa, FL, for Plaintiff–Appellant.

Jonathan Scott Brooks, Jonathan S. Brooks, PA, Deerfield Beach, FL, Nancy Wood Gregoire, Kirschbaum Birnbaum Lippman & Gregoire, Fort Lauderdale, FL, James T. Lynch, Morgan & Morgan, PA, Orlando, FL, for Defendants–Appellees.

Before WILLIAM PRYOR, JORDAN and ROSENBAUM, Circuit Judges.

PER CURIAM:

Geico General Insurance Company appeals the judgment in favor of Ann Marie Magri and against an amended complaint for a declaratory judgment that an automobile insurance policy Geico issued to Frank Galletti provided no coverage for his automobile accident. Magri sued Galletti for serious injuries that she incurred while a passenger in a vehicle being driven by, but not owned by, Galletti. Geico sought a declaratory judgment that Galletti's accident was not covered because he did not receive or reasonably believe he had permission to drive the vehicle, but at trial, a jury made a contrary finding. Geico challenges the denial of its renewed motion for a judgment as a matter of law. We affirm.

## I. BACKGROUND

We divide the background in three parts. First, we discuss the events that led to Galletti's automobile accident and Magri's lawsuit. Second, we discuss Magri's lawsuit, Galletti's automobile insurance policy, and the complaint that Geico filed for a declaratory judgment. Third, we discuss the trial.

### A. Galletti's Automobile Accident

On Friday, May 24, 2013, Galletti, his wife, and some of his clients traveled from Miami to Clermont, Florida to participate in an obstacle course race. The clients included Michael Berguiristain, Nicole Galindo, Andy Romero, and Jeanette Pardo, and they were accompanied by Jeanette's husband and son, and Romero's girlfriend, Magri. Before the trip, the group discussed going "off road" and shooting firearms in Clermont on property where Galletti's uncle, Charles Galletti, worked. The property was owned by Galletti's childhood friend, Justin Tirri, and his parents. On their arrival in Clermont, the group gathered at the home of Galletti's uncle, who everyone called "Uncle Charlie," and his long-time girlfriend, Jean Tirri.

As the group walked outside to depart for the race, they saw a pickup truck parked in front of Uncle Charlie's house and took photographs with the truck. The truck was yellow and had a logo advertising a business called "Off Road Hummer Experience." Justin Tirri owned the business, but had yet to open it to the public.

On Sunday, May 26, 2013, Galletti used his minivan to transport his wife and some of their weekend guests from his uncle's house to the Tirris' property, and the oth-

er guests followed in another vehicle. The entrance to the property had a large sign advertising Off Road and, from that vantage point, the guests could see two hangars, several Hummer vehicles, and a dune buggy. Magri, Galletti's wife, Berguiristain, Galindo, Romero, Magri, and the Pardo family were examining and photographing the vehicles when Galletti drove up in a Hummer vehicle with an Off Road logo. Everyone climbed into the vehicle and rode to an open area where they discharged firearms, after which they took turns driving the Hummer and a dune buggy parked nearby. After several hours, the group piled back into the Hummer to return to the hangar. On the return trip, Galletti made a sharp left turn that caused the vehicle to roll side over side. Several of the group incurred injuries, including Magri, who had to be airlifted to a nearby hospital and treated for head trauma.

### B. Magri's Lawsuit, Galletti's Policy, and the Geico Action for a Declaratory Judgment

Magri filed in a Florida court a personal injury action against Galletti, Off Road, and the Tirris. Galletti and his wife, who were the named insureds in an automobile insurance policy issued by Geico, notified their insurer of the lawsuit. Geico provided Galletti a defense under a reservation of rights.

Galletti's insurance policy covered "damages which [he] bec[ame] legally obligated to pay because of[ ] [b]odily injury, sustained by a person, ... arising out of the ownership, maintenance or use of the owned vehicle or a non-owned auto." The policy defined a non-owned auto as "a private passenger, farm, or utility auto or trailer not owned by, furnished or available for regular use of either you or your relative ...." For the policy to apply, Galletti had to be "driving the non-owned auto"

and its "use [had to] be with the permission, or reasonably believed to be with the permission, of the owner and to the extent of that permission."

Geico filed a complaint against the Gallettis, Magri, and other passengers in the Hummer requesting a declaratory judgment that Galletti's accident was not covered. Geico moved for summary judgment on the ground that Galletti had not been given permission to drive the Hummer vehicle. The district court denied the insurer's motion.

### C. Trial Proceedings

Galletti testified that he "basically stole" the Hummer vehicle "on the fly" so the group could "all ride together in one car." He "found [a Hummer vehicle with] a soft top that was easy to get into," "unzip[ped] the back[, reached in] and unlock[ed] the rear driver's door," and then "pretty much just hot-wired and rigged the ignition" using skills he had acquired as the fleet manager for the Aventura Police Department. Galletti acknowledged that Justin Tirri and his parents owned the Off Road property; that Tirri owned the Off Road business; that he had never discussed the accident with Tirri; and that Tirri had not pursued criminal charges or requested reimbursement for the damaged Hummer vehicle. Galletti stated that he had been childhood friends with Tirri, but they had not been in contact since high school. Galletti acknowledged that his uncle shared a home with Tirri's aunt and that there was a truck with an Off Road logo sitting in the driveway of his uncle's house on the morning of the race.

Discrepancies existed between Galletti's testimony and photographs taken before the accident. Galletti denied that his uncle was on the property before the accident, yet Magri photographed his uncle on the property before the group left in the Hum-

mer vehicle. Galletti said that the vehicle "did not break down," but there was a photograph of one passenger holding a battery charger. When asked about a photograph depicting the opened hood of the Hummer, Galletti answered that he raised the hood "to cool the engine."

Geico introduced deposition testimony from Galletti's wife, Maria, that Galletti told her sometime after the accident that he hot-wired the Hummer. She disavowed any knowledge about who owned Off Road or the property, yet she saw the truck with the Off Road logo in front of Uncle Charlie's house and stated that she had visited the Tirris' property previously to shoot firearms. Maria stated there was "nothing that looked like there was off road stuff" and there was "no off road experience," yet she acknowledged there were Hummer vehicles and dune buggies on the property.

Geico also introduced a video recording of Romero's deposition. Romero testified that, after the race, he talked to Galletti and his uncle about Off Road and then they watched "some kind of video ... of the off-roading experience" on a "Facebook page." The three men discussed "putting together" the video, which had photographs of Hummer vehicles and "GoPro kind of footage ... [of a vehicle] going through a trail" and of "a vehicle that was almost completely submerged in water." Romero had an "understanding [that Off Road] was [Galletti's] family's business," and Romero offered to help produce another video. Romero identified the yellow truck in the driveway of Uncle Charlie's house as "the truck that we rode to the race in." Romero recalled traveling to the property, where he observed "several vehicles" in the hangars and "some people ... around" who looked like "workers" because they were "moving stuff around and picking stuff up." He also noticed that "[s]everal of the hoods [of the vehicles]

were open like they were being worked on."

Magri introduced excerpts from depositions taken of Eddy Pardo, Michael Berguiristain, and Nicole Galindo. Pardo remembered that "they mentioned Off Road" when planning the trip, and Berguiristain also remembered the group planning ahead of time "to go shooting" on Sunday on "a stretch of land" that "[Galletti] [had] told us that his uncle had." Berguiristain and Galindo assumed that Galletti's family owned the yellow truck sitting in his uncle's driveway and the Hummer vehicle in which the accident occurred. Pardo "s[aw] one guy" on the property who he "th[ought] ... may have been working on a car or looking at a car or something." Berguiristain and Galindo testified they did not see anyone on site before the accident, including Galletti's uncle, but Berguiristain was uncertain whether someone came to help when the engine of the Hummer quit working or if Galletti retrieved a battery charger from the vehicle. Pardo did not remember having any mechanical problems with the Hummer and said that one of Galletti's clients was just "clowning around" in a photograph in which he was holding battery cables.

Magri testified that she did not participate in the race and instead served as "the picture taker" for the weekend. Magri authenticated several of her photographs, including images of the group posing with the yellow truck and with the Hummer vehicles on the property, of Galletti's uncle at the property before the accident, and of the raised hood of the Hummer and the battery charger in the open field. Magri described seeing the sign for Off Road as they approached the property, being greeted by and escorted to the bathroom by Galletti's uncle, and seeing workers on the property who "were dirty like mechanics." Magri also described how, after ev-

eryone climbed into the Hummer, Galletti's uncle approached the vehicle and warned Galletti to "be safe." Magri testified that the battery of the Hummer "died" while the group was out shooting and that Galletti's uncle brought them a battery charger and bottles of water. Magri also testified that Galletti's clients were a close group that she believed were wary to testify against Galletti.

The district court instructed the jury about direct and circumstantial evidence, evaluating the credibility of witnesses, and factors to consider in determining whether Galletti possessed a subjective belief that he had permission to operate the vehicle that was objectively reasonable. One hour after the jury retired to deliberate, it returned a verdict finding that "Galletti was driving the Hummer with the permission of, or with the reasonable belief that he had the permission of Justin Tirri, at the time of the accident."

## II. STANDARD OF REVIEW

We review *de novo* the denial of a motion for judgment as a matter of law. *McGriff v. Minnesota Mut. Life Ins. Co.*, 127 F.3d 1410, 1413 (11th Cir. 1997).

## III. DISCUSSION

A party is entitled to judgment as a matter of law only when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In other words, "we will not second-guess the jury or substitute our judgment for its judgment if its verdict is supported by sufficient evidence." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (brackets omitted) (quoting *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000)). We view the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmoving party. *McGriff*, 127 F.3d at 1413–14.

The parties agree that, under Florida law, the jury could consider several factors in determining whether Galletti's subjective belief that he had Tirri's permission to drive a vehicle was objectively reasonable. Those factors included, in relevant part, whether Galletti received express permission to use the vehicle; whether his use of the vehicle exceeded the permission granted; and whether he shared a relationship with the owner of the vehicle or someone permitted to act on behalf of the owner that would have caused Galletti to believe he was entitled to drive the vehicle. *See Garcia v. Geico Gen. Ins. Co.*, 712 F.Supp.2d 1316, 1320 (S.D. Fla. 2010). Before the jury could evaluate those factors, it had "as the traditional finder of the facts, ... to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Lipphardt*, 267 F.3d at 1186 (quoting *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 309–10 (11th Cir. 1988)).

The evidence, viewed in the light most favorable to Magri, was sufficient for a reasonable jury to find that Galletti thought he was entitled to drive the Hummer. The Galletti and Tirri families had longstanding relationships, which included Galletti's childhood friendship with Justin Tirri and the relationship between Tirri's aunt and Galletti's uncle. Galletti appropriated the Hummer without objection. Galletti's uncle, who worked on the property, assented to Galletti's use of the Hummer. Galletti's uncle gave the impression that he was involved in Tirri's company because he discussed the marketing of Off Road with Galletti and Romero, he drove a company vehicle, and he welcomed Galletti and his guests to company property. Galletti's uncle warned Galletti to be careful driving the Hummer, and no worker on the property attempted to stop Galletti. "[I]n a civil case, a fact may be established by circum-

stantial evidence as effectively and as conclusively as it may be proved by direct positive evidence," *Nielsen v. City of Sarasota*, 117 So.2d 731, 733 (Fla. 1960), and a jury could infer from the relationships between the Tirri and Galletti families and between Galletti and his uncle, that Galletti believed he had permission to use the vehicle and, even if he was mistaken, his belief was reasonable.

Geico argues that the jury must have found that Galletti received "actual permission to operate the Hummer" from his uncle by impermissibly drawing multiple inferences from the fact that his uncle worked on the Off Road property. *See id.* But the jury found that Galletti drove "the Hummer with the permission of, or with the reasonable belief that he had the permission of Justin Tirri" to do so. That finding is not necessarily dependent on the actual or perceived authority of Galletti's uncle. The jury could have inferred that Galletti thought he had permission to use the Hummer based on his longstanding relationship with the Tirri family and his previous use of Tirri's property. *See Liberty Mut. Ins. Co. v. Falgoust*, 386 F.2d 248, 252–53 (5th Cir. 1967) ("[T]his Court ... must give [a] party ... against whom a motion ... for judgment n.o.v. is directed the advantage of every fair and reasonable inference which the evidence justifies."). Galletti organized the weekend to include a visit to the property to go off-road, which necessarily required a vehicle other than the minivan he took on the trip. That Galletti planned a trip that included an off-road excursion without securing an appropriate vehicle beforehand suggests he thought he could use a vehicle on the property to entertain his guests. The jury could infer from several facts that Galletti believed he had permission to drive the Hummer.

Geico also argues that Magri failed to prove that Galletti subjectively believed he had permission to use the Hummer because he testified "just the opposite," but we disagree. The jury was entitled to discredit Galletti's testimony, and that finding was a reasonable one given the numerous conflicts between Galletti's account of the excursion and those given by Magri, Romero, Pardo, and Berguiristain. *See Lipphardt*, 267 F.3d at 1186. As discussed above, the jury could have found that Galletti subjectively believed he had permission to use the Hummer based on his relationship with his uncle or with Tirri and then, after the accident, voiced a contrary belief to protect his uncle and Tirri from liability. The determination whether Galletti subjectively believed he had permission to use the vehicle turned on his credibility, and that issue was for the jury to decide. *See id.* Geico contends that Galletti could not have plausibly believed he could exonerate Tirri, who had not, as required under Florida law, "voluntarily relinquished control of the vehicle," but whether Tirri could be held legally responsible is irrelevant to determining if Galletti intended to protect Tirri.

The district court did not err by denying the motion of Geico for a judgment as a matter of law. "The standard for reviewing a jury verdict is whether the state of the proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *Falgoust*, 386 F.2d at 253. There is sufficient evidence to support the jury's findings that Galletti subjectively believed he had permission to use the Hummer vehicle and that his belief was objectively reasonable.

## IV. CONCLUSION

We **AFFIRM** the judgment in favor of Magri.